THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY,
Petitioner–Appellant,

v.

BOARD OF REVIEW OF THE
COUNTY OF MONTGOMERY,
Iowa, Respondent–Appellee.

No. 03–0705.

Court of Appeals of Iowa.

June 23, 2004.

John J. Hines and Carolyn A. Rafferty of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for appellant.

Bruce B. Green and Frank W. Pechacek, Jr., of Willson & Pechacek, P.L.C., Council Bluffs, for appellee.

Robert F. Holz, Jr. and Deborah M. Tharnish of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for amicus curiae Iowa Health Care Association.

Heard by SACKETT, C.J., and HUITINK and MILLER, JJ.

SACKETT, C.J.

The focal question in this case is whether plaintiff-appellant, the Evangelical Lutheran Good Samaritan Society, is entitled to a full property tax exemption on a property it owns and operates as an eighty-eight bed skilled-nursing facility in Red Oak, Montgomery County, Iowa. The facility cares for persons whose fees are paid by the government under a provision referred to as Title XIX, and persons referred to as "private pay," whose fees are paid for from their own funds. The appellee-defendant, the Montgomery County Board of Review, determined plaintiff was entitled only to a partial exemption based on the percentage of Title XIX residents and vacancies at the facility on January 1st of the years 2000, 2001 and 2002. The district court agreed. On appeal plaintiff contends (1) the district court erred in using Iowa Code section 427.1(14) (1999) as authority for its decision to limit its exemption, (2) it is entitled to a total property tax exemption under section 427.1(8), and (3) the facility should be classified as residential property as defined by section 441.21(11). We affirm on the exemption claims and reverse and remand on the classification claim.

■ *Scope and standard of review.* The district court hears appeals from board of review decisions in equity. Iowa Code § 441.39 (2003). Our review, therefore, is de novo. Iowa R.App. P. 6.4. We look at the decision of the board of review rather than the decision of the district court. *Mayflower Homes v. Bd. of Review,* 472 N.W.2d 632, 634 (Iowa Ct.App. 1991). The statutes exempting property from taxation are strictly construed. *Atrium Village, Inc. v. Bd. of Review,* 417 N.W.2d 70, 72 (Iowa 1987). If there is any doubt upon the question, it must be resolved against the exemption and in favor of taxation. *Southside Church of Christ v.*

*Bd. of Review,* 243 N.W.2d 650, 654 (Iowa 1976) (citing *Wisconsin Evangelical Lutheran Synod v. Regis,* 197 N.W.2d 355, 357 (Iowa 1972)). In *Southside,* the court noted, "[t]he trend toward disallowing exemptions ... flows from the increasing extent and value of exempt property not on the tax rolls, and the resulting impact of such exemptions on the property taxpayer." *Id.* at 654. Exemption statutes are premised on the theory that benefits received by the community from exempted use outweigh the inequality caused by exemption of the property from taxation. Although taxation is the rule, and exemption the exception, decisions in this realm rest largely on the unique facts of each case. *Partnership for Affordable Housing, Ltd. Partnership Gamma v. Bd. of Review,* 550 N.W.2d 161, 164 (Iowa 1996); *City of Osceola v. Bd. of Review,* 490 N.W.2d 539, 540 (Iowa 1992).

**Background · facts and proceedings.** Plaintiff is a charitable non-profit society that owns, in addition to the Montgomery county facility, a number of other similar facilities across the United States. At any given time the care of over fifty percent of its residents is paid for by Title XIX. Plaintiff contends the Title XIX payments do not totally satisfy the cost of those persons receiving it in the Red Oak facility. Evidence at trial was the facility's rate for a semi-private room, the only type of room provided for Title XIX recipients, was $116, and the Title XIX payment was $103.[1] The Title XIX payment received by the facility was the second highest of sixteen comparable facilities in Iowa communities of comparable size, and its cost of $116 is the highest.

The balance of the residents in the Red Oak Facility who pay for their own care

pay a higher cost than Title XIX recipients. The facility concedes these residents pay fees in excess of the cost of their care. Evidence at trial indicated that the daily charge for private pay patients was $121.99 and the cost was $111.94.[2] These payments more than offset losses associated with the Title XIX patients.

Plaintiff has charged more for private and semi-private rooms than any other nursing home in Montgomery County that operated ·for profit. In every year between 1995 and 2002 the total facility has operated at a profit except 2002 when the facility operated at a loss, but even looking at the loss the facility had net annual revenues of approximately $92,000 in the 1995 to 2002 years.

From its inception in 1966 through 1999 the Red Oak facility was considered exempt from property taxes under Iowa Code section 427.1(8) (1999). In 2000 the county sought to impose property taxes on that percentage of the facility serving "private pay" residents who paid their own fees. Plaintiff protested assessments made in 2000, 2001, and 2002, contending it should have a full exemption, for it was a non-profit charitable organization. The defendant determined there was insufficient evidence to prove the property was used solely for the appropriate objects of the society as stated under section 427.2. Plaintiff appealed to the district court, which agreed with the board.

■ *Weight to be given to the district court findings.* Plaintiff initially complains the district court adopted the Board's proposed findings of fact and conclusions of law verbatim, thus review of the court's findings should be less deferential. Ex parte requests of counsel to submit proposed findings have been criticized.

---

1. This represents rates for one of the years but is illustrative.

2. This represents one year but is illustrative.

*See Production Credit Ass'n v. Shirley,* 485 N.W.2d 469, 475 (Iowa 1992); *Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 436 (Iowa 1984). However, here both parties apparently at the request of the district court submitted proposed findings, conclusions, and judgment following trial. Although trial courts are not encouraged to adopt findings and conclusions prepared by counsel, a separate standard of review is not applied when a trial court does so. *Care Initiatives v. Bd. of Review,* 500 N.W.2d 14, 16 (Iowa 1993); *Production Credit,* 485 N.W.2d at 471. While there are few factual disputes in this case, our ability to apply the usual deferential standard to the factual disputes is undermined by the district court's verbatim adoption of defendant's proposed factual findings and legal conclusions, because the customary deference accorded trial courts cannot fairly be applied when the decision on review reflects the findings of the prevailing litigant rather than the court's own scrutiny of the evidence and articulation of controlling legal principles. *See Rubes v. Mega Life & Health Ins. Co.,* 642 N.W.2d 263, 266 (Iowa 2002).

■ *Property tax exemption.* Plaintiff's first contention for reversal is that there is no authority to grant a partial exemption under section 427.1(14).[3] Plaintiff contends this section is not applicable because it is limited only to those engaged in some type of commercial venture. Plaintiff additionally contends it is entitled to a complete exemption under section 427.1(8),[4] and that it should not have been given only a partial exemption under the guise that the portion of the facility utilized by residents who paid the cost, or more of their care, was leased or used with a view to pecuniary profit. These two arguments are interrelated, and we address them together, as they focus to a large extent on the operation of the facility, that is, whether it is used for commercial purposes[5] and/or whether it is used with a view to pecuniary profit.

■ In order to qualify for a property tax exemption under section 427.1(8) a facility must (1) be operated by a charitable, benevolent or religious institution or society; (2) be used solely for their appropriate objects; and (3) not be operated with a view toward pecuniary profit. *Id.; see Congregation B'Nai Jeshurun v. Bd. of Review,* 301 N.W.2d 755, 756 (Iowa 1981); *Holy Spirit Retirement Home, Inc. v. Bd. of Review,* 543 N.W.2d 907, 910 (Iowa Ct. App.1995).

3. Iowa Code 427.1(14) provides:
    The assessor, in arriving at the valuation of any property of the society or organization, shall take into consideration any uses of the property not for the appropriate objects of the organization and shall assess in the same manner as other property, all or any portion of the property involved which is leased or rented and is used regularly for commercial purposes for a profit to a party or individual. If a portion of the property is used regularly for commercial purposes, an exemption shall not be allowed upon property so used and the exemption granted shall be in the proportion of the value of the property used solely for the appropriate objects of the organization, to the entire value of the property.

4. Iowa Code section 427.1(8) provides, in pertinent part:

    Property of religious, literary, and charitable societies. All grounds and buildings used or under construction by literary, scientific, charitable, benevolent, agricultural, and religious institutions and societies solely for their appropriate objects, not exceeding three hundred twenty acres in extent and not leased or otherwise used or under construction with a view to pecuniary profit.

5. Webster's Third New International Dictionary, 456 (2002), includes in its definitions of commercial 2a: "from the point of view of profit."

In the years in question,[6] the county has not sought to tax that portion of the facility devoted to Title XIX patients, so whether these three common law requirements were met for that portion of the facility is not at issue.[7] At issue is whether portions of the facility can be subject to taxation and other portions of the facility exempt from taxation. Plaintiff contends the facility is not commercial, consequently it cannot be taxed in portions, and because part qualifies it all does. *Compare* Iowa Code § 427.1(8) (total exemption) with § 427.1(14) (partial exemption if commercial use).

As we are only dealing here with the question of whether a portion of the facility can be taxed, we look to whether the plaintiff has shown that the portion of the facility the county seeks to tax meets the three common law requirements, and further, whether it meets the specific statutory requirement of "not leased or otherwise used or under construction with a view to pecuniary[8] profit," or "used for commercial purpose."

The first common law requirement that it be a charitable institution is not in dispute. The second common law requirement is based less on the plaintiff's statement of purpose than on the actual use of the property. *See Friendship Center West, Inc. v. Harman,* 464 N.W.2d 455, 457 (Iowa Ct.App.1990). Whether an organization and its "appropriate objects" are charitable is a question of fact. *May-*

*flower,* 472 N.W.2d at 634. The gratuitous or partly gratuitous care of elderly persons has been found to be a charitable purpose. *Evangelical Lutheran Good Samaritan Soc. v. Bd. of Review,* 267 N.W.2d 413, 414 (Iowa Ct.App.1978). However, the fact plaintiff gives only partial gratuitous care to the elderly needs to be considered in conjunction with the third factor which is whether its facility is operated without a view towards pecuniary profit. *See Evangelical Lutheran,* 267 N.W.2d at 415–416. And it further needs to be considered in view of whether the portion of the facility sought to be taxed is used for a commercial purpose.

In addressing these issues, the cases have considered a number of specific facts in arriving at a series of different conclusions. In denying an exemption in *Evangelical Lutheran Good Samaritan Society v. Board of Review,* 200 N.W.2d 509 (Iowa 1972), the court noted that there was no evidence plaintiff cared for anyone as a matter of charity or benevolence as it had assurance of payment by a public agency plus a guarantor. *Evangelical Lutheran,* 200 N.W.2d at 511.

In *Southside Church v. Board of Review,* the court denied a church a tax exemption on a home owned by it and built and used to provide care for foster children. *Southside Church,* 243 N.W.2d at 655. In denying the exemption the count considered the home was in competition

---

6. The district court was to say:
   The Facility operates profitably and has done so in all years since 1995, except 2001. Thus, a review of the evidence indicates that there is no question but that the *entire* facility for which the exemption is claimed does not qualify since the "private pay" portion thereof is clearly used for profit as any other business. However the issue as to the entire facility is not before us though

7. The district court, while only addressing the issue of a partial exemption for the years at issue, did find "[t]here is no evidence in the record that the entire operation is operated for a charitable and benevolent use."

8. Of or relating to money; monetary a pecuniary interest in the lawsuit.

   Black's Law Dictionary 1152 (7th ed.1999)

with some eighty other private homes in Des Moines caring for foster children. *Id.*

In *Evangelical Lutheran,* 267 N.W.2d at 416, the court granted a nursing home an exemption finding it was not operated with a view to pecuniary profit. The facility was invited to the community, $40,000 was raised for it, and it was given a farm. *Id.* at 414. The average rate of return for a three-year period was about 3.3 %. *Id.* at 415. There was substantial volunteer time given the home. *Id.* The facility was donating its physical plant and it had given a community home and assets of about two and one-half million dollars to another community and given up its interests in a hospital in another. *Id.* at 416. An expert examined the society's equity growth and surplus and gave the opinion the home was not being operated with a view to pecuniary profit. *Id.* at 415. Funds went to the society's central office for services essential to the operation of the home and excess money from one of their facilities might be loaned to another. *Id.* at 416.

An exemption was denied in *Iowa Methodist Hospital v. Board of Review,* 252 N.W.2d 390 (Iowa 1977). There, no residents were accepted who were not able to pay, and the court found some paid privately while others were welfare patients and their payment was made by a governmental agency. *Iowa Methodist,* 252 N.W.2d at 392. If they were unable to pay privately, they were told where to apply for welfare or advised of cheaper nursing homes.[9] *Id.* The facility received no financial support from the Methodist Hospital or Church. *Id.* It anticipated the fees paid would meet its operating expenses and provide a modest surplus for retirement of debt and to buy capital equipment. *Id.* at 393.

In *Dow City Senior Citizens Housing, Inc. v. Board of Review,* 230 N.W.2d 497, 500 (Iowa 1975), the court denied an exemption to a low-rent housing unit. The court noted that the government, through an FHA loan, had already assumed a large share of the burden of meeting the need for low income elderly persons as well as the fact it was providing only living space, not care. *Dow City,* 230 N.W.2d at 499.

In granting an exemption in *Richards v. Iowa Department of Revenue,*[10] 414 N.W.2d 344, 348 (Iowa 1987), the court considered substantial gifts at the inception and during the operation of the facility, the fact that the facility established a permanent endowment fund to be used for charitable disbursals to residents, and the fact the residents are guaranteed lifetime care. Though *Richards* focused more on the question of whether the housing was a charity, it also did say that charging residents fees does not indicate an institution intends to make a profit even when the income exceeds the institution's expenses. *Richards,* 414 N.W.2d at 351 (citing Annotation, *Receipt of pay from beneficiaries as affecting tax exemption of charitable institutions,* 37 A.L.R.3d 1191, 1197 (1971).)

In *Atrium Village, Inc. v. Board of Review,* 417 N.W.2d 70, 71 (Iowa 1987) a nursing home was denied an exemption despite having received many dollars from contributors, having many hours of voluntary services, having an endowment fund, setting its monthly charges according to estimates of the marginal costs of maintaining the facility, and providing proper

9. The opinion does not address whether the government payment paid all costs.

10. Unlike most similar cases as here when review by the appellate courts is de novo in *Richards* the court was engaged in judicial review of an agency action, consequently the agency was given fact findings deference because of the presumably greater expertise an agency has over matters within its purview.

care for the residents, but not accepting persons receiving benefits from Title XIX. In doing so, the court said, "in assessing the genuineness of the charity, example is more important than precept." *Atrium Village,* 417 N.W.2d at 73.

In *Friendship Center West, Inc. v. Harman,* 464 N.W.2d 455, 459–60 (Iowa Ct. App.1990), this court denied an exemption where there was no money available for financial assistance, anyone with marginal finances had to obtain a guarantor, and the facility had never reduced or made a concession on fees.

In *Carroll Area Child Care Center, Inc. v. Board of Review,* 613 N.W.2d 252, 257–59 (Iowa 2000), the court allowed an exemption though some parents paid the full charge for their children's care and others paid what the Department of Human Services allowed, which was between thirteen and seventy cents an hour less than it charged the other families. In reaching this determination the court considered that the center's charge was less than the cost of care and it obtained contributions from the community to make up the difference in addition to the concession made to low income parents. *Carroll Area,* 613 N.W.2d at 259. It rejected the Board's argument that the exemption should be limited to that percentage of clients who qualify for Department of Human Services assistance. *Id.* The court also noted while it was difficult to determine the hourly cost of providing care and contributions were a significant portion of the center's income, except for one year it had consistently operated at a loss. *Id.* at 257, n. 1.

While a review of these cases is helpful, they provide no bright line as to when a nursing homes operated by charitable organizations should be taxed. Nor do they provide a bight line for defining pecuniary profit and commercial operation. We have come to the conclusion that two terms which we see as somewhat synonymous look at whether the facility is a business whose primary focus is making money and whether its structure is to do so. Looking at the portion of the facility the defendant seeks to tax, we believe it is clear it is operated both for pecuniary profit and is a commercial enterprise.

In arriving at this conclusion we recognize there are factors which support the exemption being available to the entire facility. It is agreed the facility is operated by a charitable organization. It provides some gratuitous care of the elderly. *Evangelical Lutheran,* 267 N.W.2d at 414. It provides a level of care as opposed to just housing. *Carroll,* 613 N.W.2d at 255; *Richards,* 414 N.W.2d at 351. Some of the excess money it pays to its national organization is sometimes loaned to other facilities. Part of the money generated from the care of private pay patients is used to subsidize the care of Title XIX patients.

Certain factors weigh against the exemption. There is no charity given the private pay residents. Nor are patients who cannot pay their own way or qualify for the very substantial amount of government assistance Title XIX provides admitted. It appears that Title XIX pays close to ninety percent of the cost. There is no endowment to provide for persons unable to pay or qualify for Title XIX, nor is there any provision to provide care when residents are unable to continue to pay, as opposed to *Richards,* 414 N.W.2d at 344, where an endowment existed, financial assistance was available, and residents were guaranteed lifetime care, the presence of which the court considered in allowing the exemption. Plaintiff is in competition with a number of similar private facilities in the area and state, many of whom charge private pay patients less and receive less title XIX reimbursement despite being subject to property taxes. The Iowa Health Care

Association filed an amicus curiae brief indicating it has a membership of over fifty-five long-term care facilities operating in Iowa, including 137 non-profit facilities. (In *Southside*, 243 N.W.2d at 650, the court considered the fact the foster home seeking exemption was in competition with private homes providing care in denying the exemption). Despite being a non-profit organization, plaintiff receives few charitable contributions. It financed the purchase of the facility with bonds and cash contributions, which in 2001 and 2002 were four percent to one percent of total revenue. (In *Evangelical Lutheran*, 267 N.W.2d at 413, the community raised $40,000 and gave a farm to encourage the facility to locate there. In *Richards*, 414 N.W.2d at 344, in granting exemptions the court considered substantial gifts at the inception and operation. In *Carroll*, 613 N.W.2d at 259, in granting exemption the court considered a substantial portion of income was contributions). Plaintiff sends a substantial amount of money annually to the national organization, which from 1995 to 2001 increased its assets from $725 million to $970 million, an increase of some $245 million dollars. Yet the national organization makes no contributions to the Red Oak facility. (In *Iowa Methodist*, 252 N.W.2d at 390, the court considered the fact the facility received no money from the Methodist Church in denying an exemption.) Not only does plaintiff not receive contributions from the national organization, it sends four percent of its revenue out of state to the national organization each year, which plaintiff contends serves to reduce its administrative cost and enable them to provide low cost care. Yet the record shows them as being the highest priced facility in Montgomery County. There was expert testimony that the facility operated at a ten percent rate of return and with a view to pecuniary profit. (In *Evangelical Lutheran*, 267

N.W.2d at 413, the court considered its rate of return of 3.3 percent in granting exemption and that an expert gave the opinion it was not being operated with a view to pecuniary profit. In *Iowa Methodist*, 252 N.W.2d at 390, the court denied an exemption where fees charged would meet operating expenses with modest surplus for debt retirement and capital equipment. In *Carroll*, 613 N.W.2d at 259, in granting an exemption the court considered the center had consistently operated at a loss).

Plaintiff had minimal volunteer hours. The fact the facility enjoyed substantial volunteer help was a factor considered by the court in awarding an exemption in *Evangelical Lutheran*, 267 N.W.2d at 415. Additionally it receives substantial government funding through Title XIX and Medicare payments. (The fact the facility had received government assistance was a factor considered in denying an exemption in *Dow*, 230 N.W.2d at 497).

We agree with the district court. A facility that operates with an eye towards a profit, generally sees a ten percent return, sends four percent of its revenue to its out-of-state national organization that continues to accumulate assets and returns nothing in the way of money to the local facility, takes and keeps only those residents who qualify for government assistance that meets nearly ninety percent of their projected cost and others who pay in excess of their projected costs, and charges more than other similar facilities in the county and state, is a commercial facility operating for pecuniary profit and should not enjoy a total property tax exemption. We affirm the partial property tax exemption.

■ *Commercial or residential property.* Plaintiff also claims it should be classi-

fied as residential property instead of commercial property. Iowa Code section 441.21(11) defines "residential property:"

> "residential property" ... includes land and buildings used primarily for human habitation which land and buildings are owned and operated by organizations that have received tax-exempt status under section 501(c)(3) of the Internal Revenue Code and rental income from the property is not taxed as unrelated business income under section 422.33, subsection 1A.

*Id.* The corresponding Iowa Administrative Code sections further define and distinguish residential and commercial property.[11] Plaintiff claims it falls within the statutory definition and the Board erred in refusing to classify it as residential property. The Board argues some residents may have their own homes and receive a homestead exemption, the residents' stay at Red Oak is temporary like at a hospital or hotel, and Red Oak operates "with an eye toward pecuniary profit." Plaintiff responds that at least all of the residents receiving public assistance do not have another residence or they would not qualify for assistance. The turnover in residents is not because they are returning to their homes, as in the case of a hospital or hotel, but reflects the death of the resident. The residents at Red Oak come because their age or infirmity makes them unable to live independently.

---

11. The Iowa Administrative Code provides:

701–71.1(4) Residential real estate. Residential real estate shall include all lands and buildings which are primarily used or intended for human habitation, including those buildings located on agricultural land. Buildings used primarily or intended for human habitation shall include the dwelling as well as structures and improvements used primarily as a part of, or in conjunction with, the dwelling. This includes but is not limited to garages, whether attached or detached, tennis courts, swimming pools, guest cottages, and storage sheds for household goods. Residential real estate located on agricultural land shall include only buildings as defined in this subrule. Buildings for human habitation that are used as commercial ventures, including but not limited to hotels, motels, rest homes, and structures containing three or more separate living quarters shall not be considered residential real estate. However, regardless of the number of separate living quarters, multiple housing cooperatives organized under Iowa Code chapter 499A and land and buildings owned and operated by organizations that have received tax-exempt status under Section 501(c)(3) of the Internal Revenue Code, if the rental income from the property is not taxed as unrelated business income under Iowa Code section 422.33(1A), shall be considered residential real estate.

71.1(5) Commercial real estate. Commercial real estate shall include all lands and improvements and structures located thereon which are primarily used or intended as a place of business where goods, wares, services, or merchandise is stored or offered for sale at wholesale or retail. Commercial realty shall also include hotels, motels, rest homes, structures consisting of three or more separate living quarters and any other buildings for human habitation that are used as a commercial venture. Commercial real estate shall also include data processing equipment as defined in Iowa Code section 427A.1(1)"j", except data processing equipment used in the manufacturing process. However, regardless of the number of separate living quarters or any commercial use of the property, single- and two-family dwellings, multiple housing cooperatives organized under Iowa Code chapter 499A, and land and buildings used primarily for human habitation and owned and operated by organizations that have received tax-exempt status under Section 501(c)(3) of the Internal Revenue Code, if the rental income from the property is not taxed as unrelated business income under Iowa Code section 422.33(1A), shall be classified as residential real estate.

Iowa Admin. Code r. 701–71.1(4), (5) (2002).

The administrative code definition of commercial real estate includes examples of multiple unit properties such as hotels, motels, and rest homes. Iowa Admin. Code r. 701–71.1(5). However, such properties are not commercial real estate because of the exception that,

> regardless of the number of separate living quarters or any commercial use of the property, ... land and buildings used primarily for human habitation and owned and operated by organizations that have received tax-exempt status under Section 501(c)(3) of the Internal Revenue Code, if the rental income from the property is not taxed as unrelated business income under Iowa Code section 422.33(1A), shall be classified as residential real estate.

*Id.* The exception repeats the statutory definition of residential property in section 441.21(11).

Red Oak is property used primarily for human habitation, in contrast to "property primarily used or intended as a place of business where goods, wares, services, or merchandise is stored or offered for sale at wholesale or retail;" owned and operated by a section 501(c)(3) tax-exempt society, and the income from the property is not taxed as unrelated business income. We find nothing in the statutory definition or the administrative code relating to homestead exemptions or the length of residence as affecting the classification of property as residential or commercial. Because we find Red Oak meets the definitions of residential property and residential real estate, we conclude the district court and the Board erred in not classifying the Red Oak facility as residential. We therefore reverse the district court's decision on this issue and remand for a reclassification of the property.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**